The next case on the docket is agenda number four, number 124965, People of the State of Illinois v. Patrick A. Legoo, Mr. J. Wigman. Good morning. May it please the court, counsel. I am J. Wigman, an assistant appellate defender with the Office of the State Appellate Defender. Counsel for defendant appellate Patrick Legoo, who asserts that Section 9.4-1B, which was enacted in 2011, should be interpreted as creating a total ban on the presence of child sex offenders in parks, only as to those sex offenders who are present in a park without their children, in recognition of the fundamental liberty that a parent has to protect his child, as acknowledged and reserved in the year 2000 by the state legislature in then Section 9.4, the precursor to Section 9.3A-10 of the same subdivision. The facts of this case are extremely simple. The defendant, who was a convicted sex offender, came into a park as Section 9.3A-10 allowed him to do, because his son was also present in the park on an evening when the storm was approaching and the defendant went to retrieve his son. Section 9.3A-10 specifically states that it is unlawful for a child sex offender to knowingly be present in any public park or building unless the offender is a parent or guardian of a person under 18 years of age present in the building or on the grounds. Reading Section 9.3, the defendant was clearly acting lawfully when he went into the park to get his minor child. He was prosecuted, however, under Section 9.4-1B, which was intended to include occasions when the defendant is present and the park is empty and there aren't children. What Section 9.3A-10, when it was enacted, effectively did was allow sex offenders to be present in a park, provided that they did not approach a child, if they had their child with them. In 9.4-1, there was recognition, and this Court discussed it in a pep talk, that there are times when there is a need to exclude sex offenders from public parks, even if there are no children present and even if nobody is present, because of the size of parks, because of the ability of somebody to lay a weight. Section 9.4 essentially closed that concern and made it possible to exclude sex offenders, even if children were present, but was silent as to the statement in 9.3A-10, which says that a defendant is not acting unlawfully if he is there with his child. What 9.4-1 was meant to do is make clear by effect what they did. One of the things that was added was sex predators who committed offenses unrelated to children, thus demonstrating that the concern was not when children are present, but when children are not and even adults are. It also eliminated or redefined sex offenders so as to not include a group sometimes referred to as Romeo-Juliet offenders that was not considered to be a danger to children. In this way, what the statute effectively did was state that it is okay for a parent to be in a public park with his child, but no sex offender can be in a park if the park is empty and if no children are present. In this fashion, it met the goal that was established in 1998 when these provisions were first established. This Act started as a rule banning sex offenders from public schools except for limited circumstances. Certainly if a parent was attending a parent-teacher conference, that was allowed. If there was an official school function and the parent was with his child, that was allowed. Throughout in 1998 and then in 2000 when the first parks provision was created, parents were allowed to be present with their children, reflecting the legislature's belief and the fundamental right that a person has to be present with a child to protect one's child, to participate in the child's raising. That was considered to include, obviously, schools and public parks. This continued for at least a 10-year period. Other sections were added and other provisions were made as concerns developed. In 2010 and 2011, there was the CLEAR initiative. The CLEAR initiative was intended, it's an acronym standing for Criminal Law, Edit, Alignment, and Reform Act. The notion was to streamline statutes, to eliminate some where there was surplusage, to make things simpler and more direct for people to be able to understand. Toward that vein, sections 9.3 and 9.4 were blended together. 9.4 was, and I hesitate to use this word because I think that it's misleading, but I will say because it's a technical term, 9.4 was repealed and all of 9.4 carried over into 9.3. So what had been 9.4A became 9.3A-10. That survived and stayed and was in place. At the same time, however, when that was, when 9.4 was, let's say, withdrawn, 9.4-1B came into being. And again, it expressed several concerns. One was the Romeo and Juliet, and that seems to be the one that was most talked about. Sex predators who had not committed offenses necessarily as children were included. And the provision that said you simply can't be in a park came into place. In effect, and one note, one thing that should be noted is that when the definition of sex offender was set forth in 9.4-1, it referred to the definition that had been used in the previous provision. Notably, at first it referred to 9.4 and was later amended to change it to 9.3, indicating that there was confusion about where the statutes were and what the rules were and how this was all enacted. In essence, 9.4-1 came into being at a time when it could have been concluded that 9.4B had been eliminated and was meant to come back in. But 9.3A-10 stayed in place. So when we're looking at the statute and what it means, obviously we consider the legislative history. There's a general rule, obviously, that we look first to the plain language. But that's always followed by the caveat, when it's possible. And here it is not possible to read the plain language of one statute and read the plain language of the other and somehow understand what it is is meant, because the two are in extreme dichotomy with one another. And the learned trial judge in this case indicated that there was this kind of confusion, that you have one statute, 9.4-1, which indicates that a sex offender simply cannot be in a park. And you have another that says that a sex offender can be in a park when the child is present. But there is no way for a convicted sex offender to be present in a park and be compliant with 9.3 to approach a child, to have contact with a child, and not also be violating 9.4 if it's considered as a simple ban. There is no way to be in 9.3 circumstances without being in a public park, which 9.4 says you simply can't do. If 9.4 is read strictly as the plain language and in the absence of 9.3, then the legislature's intent, allowing children to be in parks with their parents, is not met. If it is read in the way that the defendant is advocating, then the legislature's goals of protecting the public are clearly met. The concern was not for parents being in the park with their children. That was considered to be a lesser concern, that these weren't people who were going to be grooming children by approaching them. If Mr. LeGue had not been present with his child or if he had gone into the park and his son had not been there, then the defendant would have been violating 9.4, and that provision would have been in effect and would have been effective to achieve the legislature's goals. So it's your position that you must read the exception into the statute to have them be consistent? That is correct. We're asking for that consistency. And the statutory rules of construction here require that, the doctrine of in peri materia set forth by this court in Scheib in 1979. And in People v. Davis in 2002, when this court looked to different sections of criminal code, when it looked to the Air Rifle Act, when it looked at the Firearms Owners Identification Act, compiled those three in various sections to determine the definition of a BB gun. It is not unusual or unheard of for this court to look at the entirety of the statute and look at its entire purpose in determining what specific language means, particularly when there's an inconsistency. And that's the need to look at the legislative history and what the legislative aims were. There are also rules of statutory construction that cut against your argument, and that is us reading an exemption into 9.4 that's not there, and also the fact that 9.4 contains an exclusion for the Romeo and Juliet situation, but anything that's not excluded is thereby included. Well, and in the briefs, there was a discussion of these general rules and the notion that if it's not stated in every single rule, there's a general rule that it doesn't apply for that rule. But the differences here between the statutes really are not sufficient to distinguish one from the other. It is clear that as part of the overall act, the school provisions, the park provisions, that it was intended that a parent be allowed to continue living his life with the child, even if he's a convicted sex offender. And in some of the provisions where, for instance, the Nursing Act, where there was a discussion of whether a midwife qualified as a nursing professional, and there was an exemption, and it didn't include the term midwife, that is a different provision from the instant provision where it's not as if certain sex offenders are excluded from this rule for certain offenses, but the group of parents, it is stated, are not acting unlawfully. If they are present with their child. For that reason, the fact that one of these provisions is a misdemeanor and one is a felony is also inconsequential because the language of the act says the parent is not acting unlawfully. So that distinction as well doesn't cut against us in terms of, and it makes sense that mere presence would constitute a misdemeanor, but felony action would be conducted by somebody who's not there with his child or when his child is not present and approaches a child. That's more extreme behavior that merits the felony treatment. And to that extent, 9.3A-10 and 9.4-1 work together to achieve the goal of creating safety for children. The second concern and another rule of statutory construction is that the statute is to be read in a way that doesn't create an uncertainty and also does not infringe upon constitutional right. And one of the ways that this court in particular tends to act is to avoid constitutional concerns if those constitutional concerns can be avoided. There is a constitutional right that has been protected for centuries and acknowledged most recently by this court in N.G. in the right of the parent to, not just the right, but the duty of the parent to protect his child. And it was considered necessary to allow a parent to be able to do that by entering into a partner. The question about whether there is a constitutional right was avoided by the appellate court below, which simply didn't discuss it. And could have avoided the question had it looked at the statutory construction rules that we're discussing here. This statute, these statutes, though with somewhat opposing language, can be read harmoniously so as to affect the legislative intent and avoid any sort of constitutional concerns. And that is what brings us here today. If there are any further questions? Thank you very much. Mr. Malamuth? Good morning, Your Honors. Counsel, and may it please the Court. I am Assistant Attorney General Hilda Malamuth on behalf of the people. This court should affirm defendant's conviction of being a child sex offender unlawfully in a public park, and it should do so for a reason that defendant studiously attempts to steer this court away from, the plain language of the statute under which he was convicted. Now, notably in defendant's argument, there was no dispute that he was a child sex offender as defined by Section 9.4-1, the statute under which he was convicted. There is no dispute that he was in a public park as is defined under Section 9.4-1, and there is no dispute that there was no exemption in that, in Section 9.4-1, pertaining to when his child was also in the park. So he is guilty under the plain language of the section under which he was convicted. Now, defendant asks this court to read in, and he does so quite explicitly, he asks this court to read in an exemption from a different section, Section 9.3. But this court should decline to do so, because doing so would violate multiple rules of statutory construction. Indeed, it would run afoul of the cardinal rule, which is to give effect to the legislative intent, and to do so by giving the language its plain and ordinary meaning. And as this court has already observed, this court has stated multiple times that that means not reading exemptions that are not included by the legislature. Defendant's reading also runs afoul of the principle sometimes known in Latin as expressio unius est exclusio alterius, the inclusion of one exemption indicates the exclusion of others. And here we have the inclusion of what are known as the roaming on Juliet offenses. And by including this exemption, the legislature indicated that it did not intend to include the other exemption, any other exemption, including the one in 9.3. What do you think the legislature's rationale was for putting the exemption in one section but not in the other? Well, Your Honor, the statutes are different in a variety of ways. The statutes pertain to different offenders. But some of the same offenders, child sex offenders. That's right, some of the same offenders, but not all the child sex offenders, not those guilty of roaming on Juliet offenses. The statutes address different conduct. One is the mere presence in the public park. One is not simply mere presence. The felony statute is also approaching, contacting, communicating with minors. The potential victims are different. Section 9.3 has in mind simply only minors, whereas Section 9.4-1 envisions protecting minors as well as adults. The punishment is different. Section 9.3 has a violation of that section as a Class A felony, Class 4 felony, excuse me. And Section 9.4-1 is a Class A misdemeanor. There are a whole variety of differences between the statutes. And so there might be an exemption for the higher class of felony, for the felony that wouldn't apply to a Class A misdemeanor. And there also are reasons, for instance, that run through Section 9.3, because that doesn't involve simply just parks. It involves schools, and there may be reasons why a parent might need to be in a school. So there are all sorts of reasons why an exemption might apply in Section 9.3 and not in Section 9.4-1. And indeed, reading the statutes together, the sections together, as this defendant asked this court to do, only confirms that the legislature did not intend to import this exemption into Section 9.4-1. Well, how do we know that? We know that because in creating Section 9, in drafting Section 9.4-1, legislature explicitly looks at Section 9.3 and imports what it wants to, imports the definition of child sex offender, and then tweaks it. But it does not import other things. So, for instance, it defines a public park again, even though the definitions of public park in 9.3 and 9.4-1 are exactly the same. So even though it wouldn't have had to redefine public park if we were simply to read in Section 9.3 into 9.4-1, but it does. It goes ahead and redefines it. It redefines public park. I mean, loitering, even though that is defined in Section 9.3 and the definitions are substantially the same. So clearly what the legislature did, again, is to look at 9.3, take what it wanted, and not import the rest. And one of the things that didn't work was this exemption. So there are no circumstances then under which a sex offender such as a defendant could be in the park? Well, there are circumstances that the child sex offender in 9.3 could be in the park. For instance, if he or she was ill- I'm talking about someone similarly situated to the defendant. Yes, Your Honor. If you qualify as a child sex offender under Section 9.4-1, it is a Class A misdemeanor under the plain language of the statutes to be in a public park. So it's a categorical ban then? On those sex offenders. On that group of people. That's right. So regardless of whether he has children or not, whether he's talking to his kids or not, it doesn't make any difference. That's right, Your Honor. And this is how this Court has interpreted that statute under Capitone. And actually this case provides an example of why that makes sense, why it wouldn't indeed make sense for the Court to have such an exemption. So in this case, the defendant goes on a pathway through the middle of the public park, has a brief interaction with his son, then goes back through the park on this pathway and exits. And it's perfectly reasonable to believe that the danger presented by the sex offender, by the defendant being in the public park, is not negated by some brief interaction he had with his son for the rest of the time that he's in the park. So it's both sensical and, under the plain language of the statute, true. Now, defendants seem to suggest that there's a conflict or inconsistency in the statute, in the sections. But that's not the case. The only way defendants arise at finding a conflict or inconsistency is to read the exemption in Section 9.3 as some sort of affirmative right to enter a park. But, of course, that's not what Section 9.3 does. Instead, what Section 9.3 does is it criminalizes certain conduct, prescribes certain behavior, including in Section 8-10, being in a public park if you're a child sex offender as defined by that statute. And then it creates an exemption for that particular criminal prohibition if you are in the presence of your own minor child. So it's not under 9.3. It's not unlawful to be in a park as a sex offender and approach someone, a child, as long as you're with your child. That's right. It's not unlawful, but under that particular statute. But my question is, so if a child sex offender is in a public park with his child and approaches another child, that person's actions at that point in time are both unlawful and not unlawful. No, Your Honor. They're not unlawful. What they are is prohibited by one statute. I'm sorry. Unlawful and not unlawful. Unlawful. Right. Under 9.3, that action is not unlawful as long as your child is there. But being in the park of itself is being as unlawful. So that action is both unlawful and not unlawful at the same time. No, I respectfully disagree, Your Honor. What it is is it's not prescribed, it's not prohibited, it's not unlawful under Section 9.3. That doesn't make it lawful. There is plenty of conduct out there that is not prohibited by one particular statute but is prohibited by another statute. An exemption might apply in one statute and not another. An affirmative defense might apply in one statute and not another. We point out in our brief that there are affirmative defenses that apply, for instance, to home invasion but not to criminal trespass to residence, even though both deal with being unlawfully present in the dwelling place of another. That doesn't mean that one is lawful under the home invasion statute. It just means it's not prohibited by that statute. And so this exemption in Section 9.3.810 doesn't, again, make it an affirmative right. It doesn't mean you can go ahead and do this conduct just because that section doesn't prohibit it. That's not the way criminal statutes work. Criminal statutes don't work by making lawful everything that's not prohibited by that particular statute. What a criminal statute does is simply make criminal what is described under that statute. And here it is quite clear that by looking at Section 9.4-1, it is unlawful for a child sex offender as defined by that statute to be in a public park. It doesn't make it a Class 2 felony or a Class 4 felony to go and then approach a minor, but it does make it a Class A misdemeanor under Section 9.4-1. And similarly, defendant suggests that there is a fundamental right to go to a public park. Counsel, I don't think the defendant is arguing that it's a fundamental right. He says he has the right to protect and care for his child. Well, of course, Your Honor, that's completely true that a parent has the fundamental right to control the care, custody of his or her child. That doesn't mean he has a fundamental or she has a fundamental right to go to a park. And that, of course, is evident from the fact that a town could have no parks at all and not violate the right of a parent to have the fundamental right to control and to care for his or her child. And we know that there is not a fundamental right to enter a park for a child sex offender. We know that from Peppertone, as this Court has made clear. And there's no right to enter a park even if you have a child. And that does not violate, the defendant presents no case in, as you can tell, the state, the country, which suggests that the fundamental right for the care and custody to raise your child includes the right to take him or her to every park. All that the defendant has is this one exemption in this one particular statute. A fundamental right must be deeply rooted in this nation's history and tradition. It must be implicit in the concept of order of liberty. It can't simply be created by an exemption in one particular criminal statute, especially when the very next section prohibits that conduct. So if there was any doubt... If he has a fundamental right to protect and care for his child and can go to school under that right, if the child's in the park and he hears the child's in danger and he still can't have the care and protection, to warrant him to be able to go in the park to protect the child, it seems to me that 9.4-1 can't be applied in some constitutional as applied to this defendant. Well, Your Honor, of course the necessity affirmative defense might still apply. That's something clearly different. The necessity defense broadly allows any person to engage in conduct which might otherwise be illegal if it would protect some sort of greater harm or injury than is created by the conduct. So that doesn't mean that if somehow the adult, child, sex offender parent was to receive a text that his or her child was drowning or in trouble or some sort of... And actually the necessity of defense applied, that there might not be that defense into going into the park. And indeed the defendant raised the necessity of defense here. The trial court just found that it was inapplicable. The defendant asserted at the trial court that he went to the park because it was getting late and he wanted his son to come home. But the trial court found that it was inapplicable. The child wasn't in any danger as defined by this case. The child simply watched the rest of the baseball game and then went home. And so the necessity of defense wasn't applicable. But in certain circumstances it might be. And that's a totally separate issue than saying you have a fundamental right to go to a park at any time for any reason as long as your child is there. And again, whether or not your child is even with you at the time, which is the way the defendant would like to read the exemption. But that's not under the plain language of the statute. There's no conflict between the statute, the section, and Section 9.3. And there's no fundamental right to do so. So unless this court has any other questions, we ask the court to affirm the defendant's condition. Thank you, Mr. Briggs. Mr. Wagner. Thank you. May it please the court. There are a number of issues I'd like to address. But very quickly, Justice Burke, I wanted to get back. I felt like I owed you a little bit better of an explanation or discussion about where different language is used in some instances and excluded from others and where there are different purposes of statutes. And a couple of the cases that were cited by the state referred to this, one of which was Clark, in which there was an escape provision in discussion. And there were different terms used and not used in certain sections because some referred to escape from a prison and others referred to escape where somebody was a report back from a probation referral. And it was found that there wasn't a need to use this different language because it didn't apply in that instance. In this case, there was no need for a total ban of sex offenders to specify that it would be okay for a parent to be present when his child was present because the purpose of 9.4-1 was to exclude when nobody was there or irregardless of whether or not children were there. So there's no need to say it's okay to be there with your child when that's not the point of what the statute is aiming at. It may also be, as Justice Carmeier asked, as to what was the reason for using this different language. And it may be because of what I just alluded to, that the legislature felt that there was no need, that they were covering something different, and it was already covered in 9.38-10. And one simple way that the legislature could have dealt with this concern of the competing language, at that point when they were rewriting, not substantively, but when they were restructuring, they simply could have dropped 9.38-10. It was not repealed in terms of a substantive matter. It was not gotten rid of. It was moved from one section to another. It was meant by the legislature to remain and to have import. And you'll note that 9.4-1B came at a time when there was no longer a 9.4. 9.4, had it not moved, would have been then right with 9.4-1B and read in that way. They would have not been parts of different subsections. They would have been together as a group. When you look at these, and the state talks about the plain language, but the plain language is impossible to discern here, because if you're looking, if you read no farther than 9.38-10 as a parent, and it has been said that sex offenders have to do a lot of reading. They have to know the rules that they need to follow, and there's scrupulous about it. And if you were to read through 9.38-10, you would see that your conduct was lawful because you were with your child in a public park. Then comes 9.4-1B. You almost need to read the statute backwards to know that that's going to apply to you. And even the judge at trial did not know whether or not this rule should apply. And he talked about the absurdity of, well, maybe you shelter yourself in prosecution if you get into a park and you rush to a kid. That's not what this is meant to do. And when the state says, well, he didn't just go have contact with his child, but he went in and then he went out, I don't know what else the defendant is supposed to do. And this is the case where he did the absolute minimum of what the statute permits. He went in, he looked for his child, whether he considered it an emergency for his minor child to come home as it was getting dark or not. I don't know how that question doesn't just get buried in the interpretations that are being given here. If a parent is allowed to get his child and use the parent's own judgment as to what's appropriate and when the child needs to come home, we don't know if the child simply went to the park to avoid his father and needed to come home for whatever reasons. It shouldn't require that the defendant, when he's permitted by statute to enter into a park, then also prove that there was some sort of necessity or urgency or emergency. The state also talks about this court having addressed this issue in Pepitone, but it didn't. And as Chief Justice Burke pointed out, it's a different question from being able to go into a park and being able to go into a park with your child. Pepitone involved a man who was walking his dog, and this court stated, and it's unquestioned, there's no fundamental constitutional right to enter into a park. But that's not what we're talking about. We're talking about entering into a park with your child. We're talking about entering into a school with your child. And while the state notes that there is no case until now about this exact question and whether a parent has a fundamental constitutional right perhaps to enter into a park, there's also no case that says a parent has a fundamental constitutional right to enter into a school with his child. Yet the legislature, which we rely upon to satisfy societal norms, laid out 20-some years ago this statute, starting with schools, proceeding directly to public parks, and saying this is a right that we're preserving, whether it involves a parent who has a record for a child sex offense or whether not. So it's clear that this is what the legislature intended and that it reflects society's values and fundamental rights as we view them. That question can also be avoided by simply looking at the plain language and statutory analysis. And when the state says, well, plainly, this section says nobody in a public park. And I know this isn't typical traditional legal analysis, but it makes me think of the Aesop's Fable, where a man is wearing a hat that's white on one side and black on the other. And you will never convince the people who are looking at the black side of the hat that it's white. You'll never convince the other side that they're wrong. And in a way, they're both right with what they see. If it's limited to that. But this world is not limited to just one view of one statute. The statute as a whole must be read together. And if read together, it accomplishes the aims that the legislature intended. It protects children. It protects adults from sex offenders. And it allows parents to exercise their fundamental liberty interest in time with their child, whether it's going to the baseball game with his son or just going into the park to get his son to bring him home. That is a right that all parents should have. And that was not intended to be interfered with by the legislature and by this specific provision. And I don't mean to speak ill of the legislature, because I really believe that these two read together accomplish everything they meant to. And what they meant to absolutely needed to be covered. But as I alluded to earlier, it's also possible that in this shuffle, when one statute was formed into another, and when the CLEAR initiative came along, and then this provision was added, and there was a misnumbering as to which provision was being used to create the definition of sex offender, it's possible the legislature missed it. I don't think that that's what happened. I think that the legislature knew what was happening, knew what it had on the books, and considered that to be enough and reflective of the rules that had been. If there are any further questions, I appreciate your time and I thank you. And I ask that this court reverse the appellate court and vacate the defense. Thank you. Case number 124965, People of the State of Illinois v. Catherine A. LeCoultre, will be taken under advisement as agenda number four. Thank you, Mr. Malmuth and Mr. Weisman, for your arguments this morning.